NO. 23-13436-G

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### JABIL INC.
*Appellee/Plaintiff,*

v.

### GENERAL ELECTRIC COMPANY,
*Appellant/Defendant*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

## ORIGINAL BRIEF ON BEHALF OF GENERAL ELECTRIC COMPANY

Anthony C. Walsh (GA Bar No. 735063)
GE Gas Power
4200 Wildwood Parkway
Atlanta, Georgia 30339
Telephone:  678-844-6107
Email:      anthony.walsh@ge.com

Michael D. Fisse (LA Bar No. 19270)
Paul R. Trapani, III (LA Bar No. 32735)
Patrick B. Fisse (LA Bar No. 36457)
Daigle Fisse & Kessenich, PLC
227 Highway 21
Madisonville, Louisiana 70447
Tel: 985-871-0800; Fax: 985-871-0899
Email:      mfisse@daiglefisse.com
            ptrapani@daiglefisse.com
            pfisse@daiglefisse.com
*Attorneys for General Electric Company*

## CERTIFICATE OF INTERESTED PERSONS

Appellant, General Electric Company, respectfully submits this Certificate of Interested Persons and Corporate Disclosure Statement pursuant to 11th Cir. R. 26.1-1(a):

1.  Alston & Bird LLP

2.  Brown, Kristine McAlister

3.  Carpenter, David

4.  Daigle Fisse & Kessenich, PLC

5.  Fisse, Patrick B.

6.  Fisse, Michael D.

7.  General Electric Company (stock ticker: GE)

8.  Jabil, Inc. (stock ticker: JBL)

9.  May, Hon. Leigh Martin

10. Peurach, Alexandra S.

11. Pryor, Alan

12. Trapani, III, Paul R.

13. Walsh, Anthony C.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant/Defendant, General Electric Company ("GE"), respectfully requests oral argument in consideration of this appeal. This matter concerns a Supply Agreement between GE and Appellee/Plaintiff, Jabil Inc. ("Jabil"). Pursuant to the Supply Agreement, Jabil has sought to recover the cost of excess raw material in its inventory, which Jabil claims it purchased upon receipt of alleged written forecasts issued by GE. GE denies it sent the almost weekly forecasts Jabil claims it relied upon to purchase the raw material, and Jabil admits it destroyed all the purported forecasts as part of a document retention policy (despite having first raised its claim for excess inventory to GE within the documentation retention period). Jabil also failed to produce purchase orders for the raw material that could demonstrate it did not purchase the raw material in excess of the amount, or in advance of the time, necessary to meet GE's alleged delivery schedule—a requirement under the Supply Agreement to recover for the claimed raw excess material.

In ruling in favor of Jabil on its excess inventory claim, the District Court erred in its application of New York law, which governs the terms of the Supply Agreement. To support its claim that it did not purchase the raw material in advance of the time necessary to meet the delivery schedule, Jabil relied on its policies and procedures to order raw material "just-in-time." The District Court erred in relying

on those policies and procedures when, at trial, Jabil admitted it did not follow those procedures during the project at issue.

The District Court also erred in finding that Jabil's damages were caused by GE's issuance and cancellation of the alleged written forecasts. At trial, Jabil's expert admitted that the demand within Jabil's internal supply chain management system was triggered by written forecasts, as well as by purchase orders issued by GE. Jabil's claim, however, is based only on raw material purchased pursuant to the alleged written forecasts—not GE's separate purchase orders. The record is devoid of any evidence distinguishing what raw material was purchased pursuant to GE's purchase orders versus the purported forecasts, so the District Court's award of damages is contrary to New York law given the lack of evidence supporting causation.

Further, the District Court abused its discretion in finding that GE issued the almost weekly forecasts to Jabil in any event. The District Court relied on the self-serving testimony of Jabil witnesses while ignoring key relevant documentary evidence contrary to that testimony.

GE respectfully submits that oral argument in this matter would serve this Court's interest in the efficient and appropriate use of judicial resources. Oral argument would especially assist this Court in understanding not only the record

evidence but also the scope of evidence missing from the District Court record and the legal significance of that missing evidence.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................... ii

TABLE OF CONTENTS ...................................................................................... v

TABLE OF CITATIONS ...................................................................................... vi

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ... viii

STATEMENT OF ISSUES ................................................................................... 1

STATEMENT OF THE CASE ............................................................................. 3

   1.  The Supply Agreement ............................................................................. 3

   2.  The MV4/Pyramid Project ....................................................................... 4

   3.  Jabil's Internal Policies ............................................................................ 8

   4.  Jabil's Alleged Document Retention Policy .......................................... 11

   5.  Jabil's Prior Demands for Payment ....................................................... 12

   6.  Expert Testimony ................................................................................... 15

   7.  The District Court's Judgment and Scope of Review............................. 18

SUMMARY OF THE ARGUMENT .................................................................. 21

ARGUMENT ...................................................................................................... 24

   1.  Jabil's Breach of Contract Claim is Governed by New York Law. ....... 24

   2.  The District Court Erred in Finding Jabil Ordered the Raw Material "Just-in-Time" as Required Under the Supply Agreement. ........................................ 25

   3.  The District Court Erred in Finding the Alleged Forecasts Caused Jabil's Claimed Damages. ....................................................................................... 35

   4.  The District Court Ignored Vital Evidence in Finding GE Sent Weekly Forecasts under the Supply Agreement. ......................................................... 37

CONCLUSION ................................................................................................... 43

CERTIFICATE OF COMPLIANCE .................................................................. 44

CERTIFICATE OF SERVICE ........................................................................... 45

## TABLE OF CITATIONS

## CASES

*Am. Home Prods. v. CAMBR Co., Inc.*,
　　No. 00 Civ.2021, 2001 WL 79903 (S.D.N.Y. Jan. 30, 2001) ......... 22, 35, 36

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
　　969 F. Supp. 2d 339 (S.D.N.Y. 2013) ................................................... 22, 35

*Bausch & Lomb, Inc. v. Bressler*,
　　977 F.2d 720 (2d Cir. 1992) ................................................................... 22, 35

*CIT Bank N.A. v. Schiffman*,
　　168 N.E.3d 1138 (N.Y. 2021) ....................................................... 21, 25, 26

*Davis v. Bruno's Supermarkets, Inc.*,
　　587 S.E.2d 279 (Ga. Ct. App. 2003) ........................................................ 29

*Funez v. Wal-Mart Stores E., LP*,
　　No. 1:12-cv-0259-WSD, 2013 WL 11981902 (N.D. Ga. Apr. 30, 2013).. 29

*Galetta v. Galetta*,
　　991 N.E.2d 684 (N.Y. App. 2013) ........................................................... 28

*Hirsch v. Citibank, N.A.*,
　　No. 12 Civ. 1124 (DAB), 2014 WL 2745187
　　(S.D.N.Y. June 10, 2014) ............................................................ 26, 27, 32

*Ins. Co. of N. Am. v. Lexow*,
　　937 F.2d 569 (11th Cir. 1991) ................................................................. 25

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
　　69 A.D.3d 802 (N.Y. App. 2010) ............................................................. 24

*Lundy v. Publix Super Markets, Inc.*,
　　No. 20-cv-3405-MLB, 2022 WL 124553 (N.D. Ga. Jan. 13, 2022).......... 29

*Ma. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　　597 F.3d 84 (2d Cir. 2010) ...................................................................... 27

*Martin v. Timmins*,
178 A.D.3d 107 (N.Y. App. 2019) ...................................................26, 27, 28

*Nassau Ins. Co v. Murray*,
386 N.E.2d 1085 (N.Y. 1978) .........................................................21, 26, 27

*Nealy v. Wal-Mart Stores E., LP*,
No. 19-cv-10379-AT, 2021 WL 3398145 (N.D. Ga. Jan. 26, 2021) .........29

*Pendergast v. Sprint Nextel Corp.*,
592 F.3d 1119 (11th Cir. 2010) ....................................................................25

*Salve Regina College v. Russell*,
499 U.S. 225 (1991)......................................................................................25

*Sciarretta v. Lincoln Nat'l Life Ins.*,
778 F.3d 1205 (11th Cir. 2015) ....................................................................37

*Taylor v. R.J. Reynolds Tobacco Co.*,
441 Fed. App'x 664 (11th Cir. 2011)......................................................25, 35

*Thibeault v. Travelers Ins. Co.*,
37 A.D.3d 1000 (N.Y. Sup. Ct. 2007)..........................................................28

## STATUTES

28 U.S.C. § 1332 ..........................................................................................viii

FED. R. EVID. 302 ...........................................................................................26

## OTHER MATERIAL

1 CHRISTOPHER MUELLER & LALRD KIRKPATRICK,
FEDERAL EVIDENCE § 3:14 (4th ed. Aug. 2023) ..........................................26

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenships of Jabil (Delaware and Florida) and GE (New York and Massachusetts) are different, and the amount in controversy exceeds $75,000. The District Court issued the underlying Judgment and its Findings of Fact and Conclusions of Law on September 13, 2023. *See* Findings of Fact and Conclusions of Law and Judgment [R. Docs. 157, 158]. On October 12, 2023, GE timely filed its Notice of Appeal. *See* Notice of Appeal [R. Doc. 160]. The Judgment was a final decision terminating the litigation on the merits. *See* Judgment [R. Doc. 158]; *see also* GE Response to Jurisdictional Question [App. Doc. 16]. Accordingly, this Court has jurisdiction over this appeal.

## STATEMENT OF ISSUES

1.    Under New York law, a party may prove it sent a document to another through production of the actual documentation or by proof of the sender's following its routine business practice.  Instead of offering the purchase orders into evidence demonstrating when Jabil purchased the raw material at issue, Jabil instead relied on its policies and procedures to attempt to prove it purchased the raw material "just-in-time" in compliance with its obligations under the applicable Supply Agreement.  However, Jabil admitted it did not follow those policies and procedures for the project at issue.  Did the District Court err in finding Jabil maintained its burden of proving it did not purchase the raw material in excess of the amount, or in advance of the time, necessary to meet the delivery schedule?

2.    Under New York law, the damages claimed by a plaintiff on a breach of contract claim must be sustained as a result of the breach.  Jabil has sought the cost of raw materials it purportedly purchased pursuant to written forecasts issued by GE and has not claimed the cost of raw materials purchased pursuant to GE purchase orders.  But Jabil's expert testified at trial that the demand in Jabil's internal supply chain management system consisted of both GE purchase orders and forecasted demand.  Did the District Court err in finding Jabil met its burden of proving causation of damages when the record is

1

devoid of evidence distinguishing the raw material in Jabil's inventory purchased pursuant to GE forecasts versus GE purchase orders?

3.    Jabil presented testimony at trial that GE issued almost weekly written Forecasts to Jabil, on which Jabil purportedly relied to purchase raw materials. The trial court record contains significant documentary evidence directly contradictory to Jabil's testimony.  Did the District Court err in ignoring the documentary evidence when crediting the testimony of Jabil's witnesses?

## STATEMENT OF THE CASE

### 1.   THE SUPPLY AGREEMENT

Plaintiff, Jabil, Inc. ("Jabil"), is a manufacturing services company that provides electronic and diversified manufacturing services and solutions throughout the world.  *See* Joint Stipulations [R. Doc. 144] at ¶ 1.  Defendant, GE, is a manufacturing company operating in industries like aviation, gas and power, and energy production.  *See* Joint Stipulations [R. Doc. 144] at ¶ 3.  On September 1, 2011, Jabil (then operating as Jabil Circuit, Inc.) and GE executed the Supply Agreement.  *See* Joint Stipulations [R. Doc. 144] at ¶ 5; *see also* Joint Exhibit 1 [R. Doc. 149-1].  Since 2011, the parties amended the Supply Agreement periodically to extend the terms of the Supply Agreement.  *See* Joint Stipulations [R. Doc. 144] at ¶ 6.

That Supply Agreement sets forth terms by which GE could purchase "any or all of the goods set forth that [GE] has agreed to purchase from [Jabil] . . . during the Terms of this Agreement . . . ."  *See* Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement at § 1.  The Supply Agreement authorizes Jabil to purchase raw material required to manufacture GE's products pursuant to GE purchase orders or written "Forecasts."  *See* Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement at § 6(c).  The Supply Agreement defines "Forecasts" as estimates provided to Jabil "in writing, on

3

a monthly or quarterly basis." Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement, § 1(b).

The Supply Agreement contains express provisions that limits GE's liability to Jabil for the costs of raw materials purchased (but ultimately not used) to manufacture products sold to GE. GE can only be held liable for such obsolete/excess raw material provided that Jabil:

(1) purchased the obsolete/excess material only in support of GE's purchase orders or in accordance with GE's "Forecasts" (plus any minimum or economic order quantity purchase requirements), and no sooner than reasonably appropriate to meet GE's delivery requirements;

(2) did not make any production arrangements or produce any work-in-progress or inventory in excess of the amount, or in advance of the time, necessary to meet GE's delivery schedule; and

(3) used all reasonable efforts to mitigate any GE inventory liability.

*See* Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement, § 6(c).

## 2.    THE MV4/PYRAMID PROJECT

On October 21, 2013, GE selected Jabil for the "Pyramid" or "MV4" project, which concerned the construction of certain power modules ("Power Modules") and other related products. *See* Joint Stipulations [R. Doc. 144] at ¶ 8. In its communications to Jabil awarding the MV4 project, Christopher Bensing, GE's Category Manager responsible for sourcing at the time, asked Jabil to confirm with their acknowledgment of the award so that GE could "place the first [purchase order]." *See* Joint Exhibit 2 [R. Doc. 149-2], Email from Bensing (dated Oct. 21,

2013); Tr. Tran. Day 2 [R. Doc. 148] at 275: 1-8.  Mr. Bensing was initially assigned to the MV4 project as the Category Manager, and he ultimately became the Project Leader.  *See* Tr. Tran. Day 2 [R. Doc. 148] at 275:1-14.  He testified that the MV4 project was a ground-breaking, revolutionary technology that would allow for scalable power conversion equipment for use across multiple applications in the world without having to be customized and engineered separately for every project.  *See* Tr. Tran. Day 2 [R. Doc. 148] at 275:15 – 276:19.

Mr. Bensing testified that the MV4 products GE intended to launch were immature products that had only been designed in the lab and not yet brought to market.  *See* Tr. Tran. Day 2 [R. Doc. 148] at 280:14 – 281:22.  Mr. Bensing further testified that GE drove demand for the MV4 products by issuing purchase orders, not Forecasts.  *See* Tr. Tran. Day 2 [R. Doc. 148] at 281:23-25.  Mr. Bensing identified three purchase orders GE issued for the Power Modules: Purchase Order 4500030834 (dated November 22, 2023), 4500031288 (dated January 6, 2014), and 4500033686 (dated May 5, 2014) (collectively, the "Purchase Orders").  *See* Joint Exhibits 4, 5, and 6 [R. Docs. 149-4, -5, -6].  Those Purchase Orders contained not only the quantity of Power Modules ordered, but also the breakdown of how many Power Modules GE needed for each week.  *See* Tr. Tran. Day 2 [R. Doc. 148] at 284:12 – 285:3; *see also* Joint Exhibits 4, 5, and 6 [R. Docs. 149-4, -5, -6].

Mr. Bensing testified that GE revised its quantity and timing requirements for the Power Modules through revised Purchase Orders and not through the issuance of written Forecasts. *See* Tr. Tran. Day 2 [R. Doc. 148] at 285:17 – 286:22. In fact, Mr. Bensing identified emails from Barbara Robinson at GE, in which GE communicated to Jabil that the demand for Power Modules was being revised directly onto one of the Purchase Orders. *See* Tr. Tran. Day 2 [R. Doc. 148] at 285:17 – 286:22; *see also* Joint Exhibit 36 [R. Doc. 149-36]. In direct response to a Purchase Order revision that reduced the quantity of Power Modules, Jabil claimed the Purchase Order revision could create excess raw material. *See* Joint Exhibit 36 [R. Doc. 149-36] at GE 20568-69.

Jabil claims it received almost weekly Forecasts from GE to drive demand for the Power Modules. *See* Tr. Tran. Day 1 [R. Doc. 147] at 55:8-13. Jabil claims it no longer has these weekly Forecasts in its possession due to its two-year email retention policy, but Jabil did not introduce into evidence at trial any written document retention policy. *See* Tr. Tran. Day 1 [R. Doc. 147] at 144:8-25. In support of its claim that it received these weekly Forecasts, Jabil relies on an email, which Jabil purports to be a Forecast issued by Mr. Bensing on December 10, 2013. *See* Jabil Ex. 24. Mr. Bensing testified he does not recall sending this email, but he noted that the email, on its face, is not complete and appears to be a fragment from an email. *See* Tr. Tran. Day 2 [R. Doc. 148] at 287:18 – 288:14. He explained there

6

could have been notes on this email that would have provided the proper context. *See* Tr. Tran. Day 2 [R. Doc. 148] at 287:18 – 288:19.

Without the claimed weekly Forecasts, Jabil instead relied on data from its internal SAP system and a summary reportedly created by Jabil employee, Frank Ross, to prove GE sent the alleged Forecasts at issue. Jabil claims that Mr. Ross created this summary approximately four years after the date that GE is alleged to have sent Forecasts to Jabil. *See* Tr. Tran. Day 1 [R. Doc. 147] at 124:9 – 126:12. The SAP data provided by Jabil contains no information identifying the actual source documents for the data contained therein. *See* Tr. Tran. Day 1 [R. Doc. 147] at 129:25 –130:14. The SAP data does not indicate whether any of the quantity demand stated therein was obtained from alleged written Forecasts, from the GE Purchase Orders, or from some other source. *See* Tr. Tran. Day 1 [R. Doc. 147] at 129:25 – 130:14. Jabil did not call Mr. Ross as a witness at trial, nor any individuals identified within the SAP data who would have personal knowledge of what source documents (if any) were used to input the data into its SAP system. *See* Tr. Tran. Day 1 [R. Doc. 147] at 130:24 – 131:20. Instead, Jabil presented Ms. Avis Mullen as a witness, but she conceded she did not personally convert or load any of the data into SAP. *See* Tr. Tran. Day 1 [R. Doc. 147] at 130:24 – 131:20.

Further, Jabil admits its SAP system tracks the dates it purchases raw material from its supplier, yet Jabil did not submit any documentation or testimony at trial

identifying when it purchased the raw material for which it is seeking recovery in this case. *See* Tr. Tran. Day 1 [R. Doc. 147] at 136:10 – 137:25. Ms. Mullen stated she could not testify when Jabil bought any of the raw material for the MV4 project. She did not issue any of the purchase orders for the raw material, nor did she sign purchase orders for the raw material. *See* Tr. Tran. Day 1 [R. Doc. 147] at 137:8 – 138:10. She did not identify any SAP reports to show when Jabil purchased those raw materials, nor did Jabil present at trial any purchase orders issued by Jabil to purchase the raw material at issue. *See* Tr. Tran. Day 1 [R. Doc. 147] at 137:13-25. Nor did Jabil provide testimony from any of the employees from Jabil's purchasing department that could have provided this information. *See* Tr. Tran. Day 1 [R. Doc. 147] at 138:1-13.

### 3.    JABIL'S INTERNAL POLICIES

Without the source documents of the SAP data, Jabil has relied on certain internal policies and procedures to claim its SAP data is accurate and Jabil purchased its material in accordance with the requirements in the Supply Agreement. Jabil did not introduce into evidence its written policies and procedures. Rather, former Jabil employee, Mr. Scott Gebicke (who was not involved with the MV4 project during the relevant time period), testified regarding his recollection of the policies and procedures Jabil uses, in general, to manage its supply chain.

8

As explained by Mr. Gebicke, Jabil would first get a document from the customer outlining its requirements. *See* Tr. Tran. Day 1 [R. Doc. 147] at 239:2-4. Jabil would then upload the requirements into its SAP system and perform a variance analysis showing how the customer requirements may have changed from earlier reporting; this analysis would be sent to the customer. *See* Tr. Tran. Day 1 [R. Doc. 147] at 239:5-15. Before purchasing additional raw material pursuant to a new Forecast or other document providing for the customer's demand, Jabil's reported policy was to wait for the customer to verify those changes before issuing its own purchase orders for additional raw material. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:5-15. Mr. Gebicke testified that if these procedures did not happen on the MV4 project, that would have been a violation of Jabil's policies. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:13-15. He also testified that if Jabil does not follow its policies and procedures regarding supply chain management, it could result in Jabil having excess inventory. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:16-19.

Mr. Gebicke had no personal knowledge about any of the interactions between Jabil and GE during the MV4 project prior to when he became the head of Jabil's Industrial Group in January 2016. *See* Tr. Tran. Day 1 [R. Doc. 147] at 230:21-25. Had Mr. Gebicke had personal involvement in the MV4 project during the time at issue, he would have realized Jabil did not fully follow Jabil's policies and procedures. In particular, Ms. Mullen confirmed that, on the MV4 project, Jabil did

not wait for confirmation from GE before purchasing any raw material from the purported Forecast documents. *See* Tr. Tran. Day 1 [R. Doc. 147] at 142:4-14.

Mr. Gebicke also testified that when there are large inventory discrepancies, he has investigated the details of those discrepancies. *See* Tr. Tran. Day 1 [R. Doc. 147] at 235:18-22. And when he has performed these investigations, he looks at it "from all sides," looking at, among other things, customer forecasts, customer correspondence, production forecast, and material inventory. *See* Tr. Tran. Day 1 [R. Doc. 147] at 235:18 – 236:2. He also testified that he would want to see emails from the customer showing what certain amounts of material were needed. *See* Tr. Tran. Day 1 [R. Doc. 147] at 236:3-8. Despite having regularly performed such investigations for excess inventory in the past, he performed no such investigation specifically for the MV4 project, much less had he seen results of any such investigation.

Mr. Gebicke also testified that Jabil conducts audits regarding the lead time quoted by suppliers and compares it to the lead times actually input into the SAP system. *See* Tr. Tran. Day 1 [R. Doc. 147] at 238:4-12. Those audits are sometimes performed when there is excess inventory or performed as spot checks. *See* Tr. Tran. Day 1 [R. Doc. 147] at 238:4-19. Mr. Gebicke was not aware of any such audit being performed by Jabil for the MV4 project, nor did Jabil submit any such audit at trial. *See* Tr. Tran. Day 1 [R. Doc. 147] at 238:4-19; 243:11-15.

### 4. JABIL'S ALLEGED DOCUMENT RETENTION POLICY

Jabil claims that it would have received over thirty (30) emails from GE sending written Forecasts from December 2013 through September 2014, and Jabil also claims it would have sent the same number of emails back to GE with verification reports. *See* Tr. Tran. Day 1 [R. Doc. 147] at 143:19 – 144:4. Jabil claims it no longer has these approximately sixty (60) emails because of its two-year email retention policy. *See* Tr. Tran. Day 1 [R. Doc. 147] at 144:8-25. But Jabil has produced—and has relied upon—documents more than two years old (*i.e.*, documents that fall outside of its purported document retention policy time period). Specifically, Jabil has introduced documents dated December 17, 2014 (Joint Exhibit 40 [R. Doc. 149-40]), November 22, 2013 (Joint Exhibit 41 [R. Doc. 149-41]), November 18, 2014 (Joint Exhibit 42 [R. Doc. 149-42]), and January 5, 2015 (Joint Exhibit 13 [R. Doc. 149-13]). *See also* Tr. Tran. Day 1 [R. Doc. 147] at 146:16 – 148:25. At trial, Jabil admitted it was relying on documents in its case-in-chief that are from the same time period that Jabil claims it destroyed emails as a result of its purported retention policy, but Jabil provided no witnesses that could address this discrepancy during trial. *See* Tr. Tran. Day 1 [R. Doc. 147] at 150:3-6. Jabil also did not provide any evidence that its reported two-year email retention policy also applies to other forms of documents, such as Jabil's purchase orders for the raw

11

material at issue (none of which were produced at trial).  *See also* Tr. Tran. Day 1 [R. Doc. 147] at 150:3-6.

**5.    JABIL'S PRIOR DEMANDS FOR PAYMENT**

In this litigation, Jabil is demanding recovery for costs of excess raw materials that it claims to have purchased based on Forecasts it allegedly received from GE prior to October 2014.  But before filing the instant litigation, Jabil made various demands to GE for the same raw material at issue without ever claiming that it had received pre-October 2014 Forecasts.  In 2016, 2017 and 2018 (before filing this action), Jabil made multiple claims against different GE representatives for the excess materials that are at issue in this action, but without ever referencing any pre-October 2014 Forecasts in its communications with GE.  On May 17, 2016, Glenn Sawyers, the head of the GE account for Jabil at the time, sought payment for the claimed excess material but never mentioned any pre-October 2014 Forecast.  *See* Joint Ex. 29 [R. Doc. 149-29] at 1.  Instead, he only referenced GE's Forecast dated October 16, 2014 and attached that Forecast to his email.  *See* Joint Ex. 29 [R. Doc. 149-29] at 1.  Similarly, on November 15, 2016, Jabil wrote to GE demanding payment for the excess material, stating, in pertinent part, "Pursuant to this settlement, on October 16, 2014, GE provided forecasts with demand for related Power Modules, and under [the Supply Agreement] terms, Jabil purchased appropriate raw materials."  *See* Joint Exhibit 38 [R. Doc. 149-38] at 1.  Again,

nowhere did Jabil claim that the purported excess material was purchased pursuant to Forecasts issued prior to October 2014. *See* Joint Exhibit 38 [R. Doc. 149-38] at 1.

On May 21, 2017, Jabil sought payment from a different GE representative, Ann Marie Monahan. *See* Joint Exhibit 45 [R. Doc. 149-45]. Ms. Mullen admitted that because Ms. Monahan was not involved in the day-to-day activities of the MV4 project, Jabil provided Ms. Monahan with the background of its claim. *See* Tr. Tran. Day 1 [R. Doc. 147] at 173:11 – 174:7. Ms. Mullin testified that it was important to provide Ms. Monahan accurate information for her evaluation. *See* Tr. Tran. Day 1 [R. Doc. 147] at 173:11 – 174:7. Yet in Jabil's correspondence to Ms. Monahan, Jabil did not mention any pre-October 2014 Forecasts allegedly issued by GE. Instead, the email to Ms. Monahan only referenced the October 16, 2014 Forecast. *See* Joint Exhibit 45 [R. Doc. 149-45]. In addition, the more detailed timeline attached to that email references the GE Purchase Orders issued to Jabil but makes no reference to pre-October 2014 Forecasts. Instead, it only references the October 16, 2014 Forecast. *See* Tr. Tran. Day 1 [R. Doc. 147] at 174:11 – 175:21; Joint Exhibit 45 [R. Doc. 149-45] (attached Timeline).

On July 18, 2018, Ms. Mullen contacted a different GE representative, Nikhil Kapur. Mr. Kapur was also not involved with the day-to-day activities on the MV4 project. *See* Tr. Tran. Day 1 [R. Doc. 147] at 176:24 – 175:7; Joint Exhibit 43 [R.

Doc. 149-43]. Mr. Kapur specifically asked for additional information regarding Jabil's excess inventory claim, and Ms. Mullen responded to Mr. Kapur without (1) mentioning any of the alleged pre-October 2014 Forecasts or (2) attaching any pre-October 2014 Forecasts. Instead, the stated basis of Jabil's claims was only the October 16, 2014 Forecast. *See* Tr. Tran. Day 1 [R. Doc. 147] at 177:12 – 178:16; Joint Exhibit 43 [R. Doc. 149-43]. A few weeks later (on August 17, 2018), Jabil provided Mr. Kapur (at his request) with a presentation containing additional bullet points regarding Jabil's claim, again referencing only the October 2014 Forecast. *See* Tr. Tran. Day 1 [R. Doc. 147] at 178:17 – 180:9; Joint Exhibit 48 [R. Doc. 149-48].

Ms. Mullen testified that during these pre-litigation discussions, GE did not dispute the data in Jabil's SAP system. *See* Tr. Tran. Day 1 [R. Doc. 147] at 99:23 – 100:2. But Ms. Mullen's testimony is inconsistent with the documentary evidence, which demonstrates that GE employee, Jose Fitz Gibbon, made specific inquiries related to the quantity of raw material Jabil claimed it was in its possession. *See* Joint Exhibit 33 [R. Doc. 149-33] at GE 18070, GE Comments (4/13/15) Column (inquiring why Jabil had 631 modules worth of certain components, 380 modules worth of another component, 546 modules worth of other components, *etc.*). Notably, Joint Exhibit 33 shows Jabil did not respond to any of Mr. Fitz Gibbon's inquiries regarding the number of components Jabil was claiming in its inventory.

14

*See* Joint Exhibit 33 [R. Doc. 149-33] at GE 18070, Jabil Comments (4/13/15), Jabil

Comments (5/6/15), Jabil Comments (5/28/15) Columns.

**6.    EXPERT TESTIMONY**

GE presented the testimony of supply chain expert, Rosemary Coates.  Ms.

Coates has experience evaluating excess and obsolete inventory claims, including

excess inventory claims involving contract manufacturers such as Jabil.  *See* Tr.

Tran. Day 2 [R. Doc. 148] at 350:10 – 21.  She testified as to the types of documents

and data required for the presentation and analysis of such claims, including the (1)

forecast data; (2) how that forecast translates into a bill of materials break-down; (3)

the lead times of the materials; (4) available inventory; and (5) when the contract

manufacturer issued purchase orders for the raw material.  *See* Tr. Tran. Day 2 [R.

Doc. 148] at 350:22 – 351:18.  Ms. Coates further explained why a company's

supply chain management policies and procedures are insufficient by themselves to

support an excess inventory claim.   As she explained, the manufacturing

environment is complex with many different variables; and while a company's

policies and procedures are helpful in determining an excess inventory claim, they

do not provide the complete picture of events as they actually occur.  *See* Tr. Tran.

Day 2 [R. Doc. 148] at 355:2 – 356:5.  She also explained that any E.R.P. system[1]

(such as the SAP system used by Jabil) is software that helps run various functions

---

[1] E.R.P. stands for "Enterprise Resource Planning."

of a business' operations, but such systems are not automated and require human input that is subject to human error. *See* Tr. Tran. Day 2 [R. Doc. 148] at 358:19 – 360:7.

Ms. Coates explained how the analysis of Jabil's excess inventory claim was precluded by Jabil having no evidence of when it executed the purchase orders for the raw materials at issue. *See* Tr. Tran. Day 2 [R. Doc. 148] at 350:22 – 351:18. Ms. Coates also explained that Jabil did not put any notations into its SAP system that would have confirmed the documentary basis to support its input of demand quantities. *See* Tr. Tran. Day 2 [R. Doc. 148] at 360:8-19. She explained that using such notations (or otherwise attaching the document driving the demand quantities into the SAP system itself) to maintain a record of what changes were made into the system and the basis of such changes. *See* Tr. Tran. Day 2 [R. Doc. 148] at 360:20 – 361:13. Ms. Coates testified that neither she nor any other analyst could evaluate Jabil's excess material claim without Jabil providing (1) the information that Jabil relied upon to input the demand quantities into the SAP system and (2) the information regarding when Jabil purchased the raw materials issue. *See* Tr. Tran. Day 2 [R. Doc. 148] at 365:4 – 366:3.

In rebuttal to Ms. Coates' expert testimony, Jabil tendered Mr. James Mottern as an expert in E.R.P. systems and supply chain management. *See* Tr. Tran. Day 2 [R. Doc. 148] at 402:16-21. Mr. Mottern testified that the demand quantities

identified in Jabil's internal SAP system consisted of two types of demand—the GE Purchase Orders and "forecasts that were discussed on a weekly basis . . . ." *See* Tr. Tran. Day 2 [R. Doc. 148] at 419:6-11. Mr. Mottern did not provide any testimony stating how much of the raw material was purchased pursuant to the GE Purchase Orders versus the alleged Forecasts. Mr. Mottern critiqued Ms. Coates' opinion as too high level. *See* Tr. Tran. Day 2 [R. Doc. 148] at 424:3-5. But Mr. Mottern confirmed that he was retained by Jabil and had access to any information he may have needed to perform his analysis. *See* Tr. Tran. Day 2 [R. Doc. 148] at 424:21-23. Yet he did not speak to any individuals at Jabil that would have actually input the demand data into Jabil's SAP system. *See* Tr. Tran. Day 2 [R. Doc. 148] at 424:24 – 425:2. Nor did he speak to anyone in Jabil's purchasing department that would have issued purchase orders for the raw materials at issue. *See* Tr. Tran. Day 2 [R. Doc. 148] at 425:19-24. He did not discuss the SAP waterfall chart with its creator, Mr. Frank Ross; he did not review (or ask for) Jabil's purported document retention policy; he did not review (or ask for) Jabil's written supply chain management policies; and he did not ask anyone at Jabil to run a report showing the date Jabil issued the purchase orders for the raw material at issue. *See* Tr. Tran. Day 2 [R. Doc. 148] at 426:11 – 427:11; 431:3-6.

Mr. Mottern opined that he believed Jabil's orders for the material were placed "just-in-time" because of the "JIT" notation next to some of the entries on Jabil's

17

report showing purchase orders it issued for the raw material. *See* Tr. Tran. Day 2 [R. Doc. 148] at 428:21 – 25. However, he confirmed that in Jabil's purchase order report, not all the purchase orders have a JIT notation. *See* Tr. Tran. Day 2 [R. Doc. 148] at 435:2-21. Mr. Mottern also confirmed that although he had access to any information from Jabil he may have needed, he did not perform an independent analysis of the data in Jabil's SAP system. *See* Tr. Tran. Day 2 [R. Doc. 148] at 432:2-4.

**7.    THE DISTRICT COURT'S JUDGMENT AND SCOPE OF REVIEW.**

Following a bench trial, the District Court entered its Judgment [R. Doc. 158] and Findings of Fact and Conclusions of Law [R. Doc. 157] on September 13, 2023. The District Court found Jabil satisfied the requirements of the Supply Agreement for the recovery of raw material and awarded Jabil $2,128,992.91, reflecting the cost of all raw material Jabil asserted was in its inventory related to the MV4 project.[2]

As detailed below, the District Court applied the incorrect legal standard under New York law in finding that Jabil satisfied the second element of the Supply Agreement—that it did not make any production arrangements or produce any work-in-progress or inventory in excess of the amount, or in advance of the time necessary to meet GE's delivery schedule—thereby warranting *de novo* review.    While the

---

[2] The Judgment also addressed Jabil's claim for certain unreturned Power Modules and carrying and storage costs. *See* Judgment [Doc. 158] at 1. Those rulings are not at issue in this appeal.

District Court relied on Jabil's policies and procedures to support its finding that Jabil ordered the raw material "just-in-time" as required by the Supply Agreement, the District Court erred in relying on those policies and procedures in light of the testimony at trial that Jabil did not follow those very same policies and procedures.

*De novo* review is also warranted because the District Court erroneously applied New York law in finding Jabil's damages were caused by GE's purported breach of contract. Jabil's own supply chain management expert admitted that the demand for raw material in Jabil's SAP system consisted of both GE Purchase Orders and the alleged weekly forecasted demand. *See* Tr. Tran. Day 2 [R. Doc. 148] at 419:6-11. So, even if GE issued Forecasts as alleged (which is denied), the record is devoid of any evidence distinguishing what raw materials Jabil purchased pursuant to GE Purchase Orders versus raw material it allegedly purchased pursuant to the purported GE Forecasts.[3]

Finally, GE contends the District Court abused its discretion in finding GE issued the alleged weekly Forecasts to Jabil, thereby triggering Jabil's purchase of raw material under the Supply Agreement. As detailed below, the District Court

---

[3] Jabil has only filed this action for the recovery of costs for raw material allegedly purchased pursuant to purported Forecasts issued before October 2014, so any raw materials purchased pursuant to GE Purchase Orders is immaterial and unrecoverable.

ignored the documentary evidence directly refuting the testimony it relied upon in

support of the Judgment.

## SUMMARY OF THE ARGUMENT

In ruling in favor of Jabil on its excess inventory claim, the District Court erred in applying New York law, which governs the terms of the Supply Agreement. To support its claim that it did not purchase the raw material in advance of the time necessary to meet the delivery schedule, Jabil relied on its policies and procedures to order raw material "just-in-time." New York has long recognized a party can establish that a document was sent to another or that some other action was taken through evidence of (1) direct evidence of the documentation/action or (2) by proof of regularly followed routine business practice. *See CIT Bank N.A. v. Schiffman*, 168 N.E.3d 1138, 1142 (N.Y. 2021). Evidence of "an established and regularly followed office procedure" may give rise to a rebuttable presumption that a party sent a document, but it is well-settled that such a presumption does not arise if the routine office practice was not followed. *See id.* at 1143 (citing *Nassau Ins. Co v. Murray,* 386 N.E.2d 1085 (N.Y. 1978)). Here, the District Court erred in relying on Jabil's claimed policies and procedures when, at trial, Jabil admitted it did not follow those procedures during the MV4 project. Without sufficient evidence that it did not purchase the material in advance of the time necessary to meet the discovery schedule, Jabil did not meet its burden of proof.

The District Court also erred in finding that Jabil's damages were caused by GE's issuance and cancellation of the alleged written Forecast. Under New York

21

law, the damages claimed by the plaintiff on a breach of contract claim must be suffered as a result of the breach. *See*, *e.g.*, *Bank of Am., N.A. v. Bear Sterns Asset Mgmt.*, 969 F. Supp. 2d 339, 350-51 (S.D.N.Y. 2013); *see also Bausch & Lomb, Inc. v. Bressler,* 977 F.2d 720, 731 (2d Cir.1992); *Am. Home Prods. v. CAMBR Co., Inc.,* No. 00 Civ.2021, 2001 WL 79903, at *4 (S.D.N.Y. Jan. 30, 2001). Jabil's expert admitted that the demand in Jabil's SAP system triggering the purchase of raw material consisted of both GE Purchase Orders and the alleged weekly forecasted demand. *See* Tr. Tran. Day 2 [R. Doc. 148] at 419:6-11. The SAP data does not identify what the source of the data is, nor did Jabil produce any witnesses who input that data into the SAP system or who could otherwise provide information regarding what raw material was purchased pursuant to the alleged Forecasts versus separate Purchase Orders. So, even if GE issued Forecasts (which is denied), Jabil's inability to distinguish between the raw material it allegedly purchased pursuant to the purported Forecasts (which is the basis of its claim) versus the raw material it allegedly purchased pursuant to the Purchase Orders (which has not been claimed in this litigation) is fatal to its claim for damages. Thus, the District Court erred in awarding damages to Jabil.

Further, the District Court abused its discretion in finding that GE issued the weekly Forecasts. The District Court relied on the self-serving testimony of Jabil witnesses while ignoring key relevant documentary evidence contrary to that

testimony.  For instance, although Jabil relies on a document retention policy to explain why it has not produced the Forecasts at issue, Jabil's production of documents from the same time period raises significant doubts.  The existence of the weekly Forecasts is also doubtful considering Jabil's continuous pre-litigation demands to GE that reference nothing about the claimed Forecasts.  Jabil's internal SAP data also does not provide any information on the source of the quantity data therein, and Jabil did not produce any witnesses with personal knowledge about the source documents used to input that data.  The District Court erred in ignoring the documentary evidence and crediting the testimony of Jabil's witnesses that is contradicted by same.

# ARGUMENT

1. ## JABIL'S BREACH OF CONTRACT CLAIM IS GOVERNED BY NEW YORK LAW.

The Supply Agreement is governed by New York law. *See* Joint Ex. 1 [R. Doc. 149-1], Supply Agreement at § 13 & App'x 2, § 20. The elements of a cause of action to recover damages for breach of contract under New York law are: (1) the existence of a contract; (2) the plaintiff's performance under the contract; (3) the defendant's breach of that contract; and (4) resulting damages. *See*, *e.g.*, *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803 (N.Y. App. 2010). Therefore, to prevail on its breach of contract claim, Jabil must prove it satisfied all its obligations under the Supply Agreement. Namely, Jabil must prove three elements under the Supply Agreement: (1) it purchased the obsolete/excess material only in support of GE's purchase orders or in accordance with GE's "Forecasts" (plus any minimum or economic order quantity purchase requirements) and no sooner than reasonably appropriate to meet GE's delivery requirements; (2) it did not make any production arrangements or produce any work-in-progress or inventory in excess of the amount, or in advance of the time, necessary to meet GE's delivery schedule; and (3) it used all reasonable efforts to mitigate any GE inventory liability. Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement, § 6(c).

**2.    THE DISTRICT COURT ERRED IN FINDING JABIL ORDERED THE RAW MATERIAL "JUST-IN-TIME" AS REQUIRED UNDER THE SUPPLY AGREEMENT.**

The District Court applied the incorrect legal standard under New York law in finding that Jabil satisfied the second element of the Supply Agreement—namely, that it did not make any production arrangements or produce any work-in-progress or inventory in excess of the amount, or in advance of the time, necessary to meet GE's delivery schedule.  Courts of appeal review a district court's application of state law in a diversity case *de novo. See Taylor v. R.J. Reynolds Tobacco Co.*, 441 Fed. App'x 664, 665 (11th Cir. 2011) (citing *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119 (11th Cir. 2010)); *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991); *Ins. Co. of N. Am. v. Lexow,* 937 F.2d 569, 571 (11th Cir. 1991).

Jabil did not provide evidence of the date it purchased the raw material at issue, so it relied on its policies and procedures to prove that it issued purchase orders for the raw material "just-in-time" to meet GE's purported delivery schedule.  In ruling in favor of Jabil, the District Court erroneously found the mere existence of Jabil's alleged "just-in-time" policy was sufficient to satisfy its burden of proof when Jabil admitted it did not follow those very policies during the MV4 project.  As noted by its highest court, New York has long recognized a party can establish that a document (like the purchase orders for the raw material at issue) was sent to another (or some other action was taken) through evidence of (1) the actual documentation or (2) by proof the sender's regularly followed routine business practice.  *See CIT*

*Bank N.A. v. Schiffman*, 168 N.E.3d 1138, 1142 (N.Y. 2021); *Martin v. Timmins*, 178 A.D.3d 107, 110 (N.Y. App. 2019). Evidence of "an established and regularly followed office procedure" may give rise to a rebuttable presumption that a party followed those procedures, but it is well-settled that such a presumption does not arise if the routine office practice was not followed. *See id.* at 1143 (citing *Nassau Ins. Co v. Murray,* 386 N.E.2d 1085 (N.Y. 1978)); *see also* FED. R. EVID. 302 ("In a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."); 1 CHRISTOPHER MUELLER & LALRD KIRKPATRICK, Federal Evidence § 3:14 (4th ed. Aug. 2023) ("Rule 302 actually *assumes* that federal courts apply state presumptions where they bear on claims governed by state law, and Rule 302 then requires 'the effect' of every such state presumption to be determined in accordance with the law of the state in question.") (emphasis in original).

For example, in *Hirsch v. Citibank, N.A.*, No. 12 Civ. 1124 (DAB), 2014 WL 2745187, at *11 (S.D.N.Y. June 10, 2014), Citibank argued the plaintiffs were subject to the arbitration provision within its Client Manual. Citibank relied on its policy and practice requiring its employees to give the Client Manual to customers in support of its assertion that the plaintiffs received the manual and, therefore, were subject to its terms and conditions. *See id.* Citibank offered two documents in support of its argument—a "Personal Bankers Foundation" manual and a "Welcome

26

Folder" that is supposed to be given to all customers. *See id.* at *12. Yet the court noted that the record was devoid of any independent evidence establishing that those policies were followed or were otherwise sufficient to ensure the plaintiffs' receipt of the Client Manual. *See id.* at *13 ("In fact, the only evidence of Defendant's employees distributing the Client Manual that might be considered either objective or contemporaneous, the 'Customer Care Checklist,' is unknown to some employees, unused by others, and disposed of in some manner by most."). The court found that evidence that Citibank did not follow its claimed policies and procedures precluded it from relying on those procedures to prove the plaintiffs received (and accepted) the arbitration agreement:

> However, "a claim of no receipt," [*Nassau Ins. Co. v. Murray*, 386 N.E.2d 1085, 1085 (N.Y. 1978], coupled with evidence tending to "show[ ] that routine office practice was not followed or was so careless that it would be unreasonable to assume that the notice was mailed," will negate any such presumption. [*Ma. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010) (quoting *Nassau Ins. Co.*, 46 N.Y.2d at 830, 414 N.Y.S.2d 117, 386 N.E.2d 1085)]. The testimony and documentary evidence cited below make clear that Citibank's employees did not consistently follow account opening policies, and sometimes the prescribed steps were not followed at all. Therefore, even if Defendant presented enough evidence to show a corporate policy, Citibank would still fail on this question.

*See id.* at *14;

Similarly, in *Martin v. Timmins*, 178 A.D.3d 107 (N.Y. App. 2019), the defendant physician testified regarding his custom and practice for placing sutures during a hernia repair to demonstrate he properly performed the medical procedure

at issue. *See id.* at 109. After the jury ruled in favor of the defendant, the appellate court reversed, finding the trial court erroneously admitted evidence regarding the physician's custom and practices because the evidence at trial demonstrated that difference procedures were used when implanting the specific medical device at issue. *See id.* at 110. The appellate court stressed that under New York law "[c]ustom and practice evidence draws its probative value from the repetition and unvarying uniformity of the procedure involved as it depends on the inference that a person who regularly follows a strict routine in relation to a particular repetitive practice is likely to have followed that same strict routine at a specific date or time relevant to the litigation." *See id.* (quoting *Galetta v. Galetta*, 991 N.E.2d 684 (N.Y. App. 2013)) (internal quotations omitted). Therefore, because the actual procedures used for the surgical procedure differed from custom and practices identified by the defendant, the court of appeal found the trial court erred in allowing the defendant to testify about his standard practices. *See id.* at 111; *cf. Thibeault v. Travelers Ins. Co.*, 37 A.D.3d 1000, 1000-01 (N.Y. Sup. Ct. 2007) (After the district court granted summary judgment in favor of the insurer, the New York Superior Court reversed, finding the evidence submitted demonstrated that the insurer's policies and procedures were insufficient to provide the insured with actual notice of the cancellation).

The inability of a party to rely on the mere existence of policies and procedures in the face of evidence that those policies are not followed is also routinely recognized in this Circuit. *See Lundy v. Publix Super Markets, Inc.*, No. 20-cv-3405-MLB, 2022 WL 124553, at *4 (N.D. Ga. Jan. 13, 2022) (noting party failed to provide proof the company's inspection policy was followed on the day of the alleged incident); *Davis v. Bruno's Supermarkets, Inc.*, 587 S.E.2d 279, 281 (Ga. Ct. App. 2003) (evidence of the store's general inspection policies and procedures insufficient because it did not show that he personally observed or conducted the inspection); *Nealy v. Wal-Mart Stores E., LP*, No. 19-cv-10379-AT, 2021 WL 3398145, at *11–12 (N.D. Ga. Jan. 26, 2021) (noting evidence insufficient to merely state the inspections "were conducted" and procedures "were followed"); *Funez v. Wal-Mart Stores E., LP*, No. 1:12-cv-0259-WSD, 2013 WL 11981902, at *4 (N.D. Ga. Apr. 30, 2013) ("Simply put, while he may be able to testify generally about Defendant's inspection procedures, Murray fails to provide a factual basis for his statement that the inspection procedures were being carried out at the time of Plaintiff's fall.").

Here, Jabil did not produce any documentation proving when it ordered the raw material at issue (even though Jabil admits its SAP system tracks the dates it purchases raw material from its supplier (*see* Tr. Tran. Day 1 [R. Doc. 147] at 136:10 – 137:25)). Instead, Jabil presented the testimony of former Jabil employee, Mr.

Gebicke, in support of the existence of certain policies and procedures Jabil implements to ensure it purchases raw material "just-in-time." Specifically, Mr. Gebicke outlined from his recollection (but not from the written policies and procedures themselves) the process that Jabil uses to manage its supply chain. In particular, Jabil would get a document from the customer outlining its requirements. *See* Tr. Tran. Day 1 [R. Doc. 147] at 239:2-4. Jabil would then upload the requirements into Jabil's SAP system and perform a variance analysis (an "M.P.S. report") showing how the customer requirements may have changed from earlier reporting, which would be sent to the customer. *See* Tr. Tran. Day 1 [R. Doc. 147] at 239:5-15. Before purchasing additional raw material pursuant to a new Forecast or other document providing for the customer's demand, Jabil's reported policy was to wait for the customer to verify those changes before issuing its own purchase orders for additional raw material. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:5-15. If these procedures did not happen on the MV4 project, that would have been a violation of Jabil's policies. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:13-15. Importantly, as Mr. Gebicke admitted, if Jabil does not follow its policies and procedures, it could lead to Jabil having excess material—such as the very excess material Jabil is claiming in this litigation. *See* Tr. Tran. Day 1 [R. Doc. 147] at 242:16-19.

In contrast, Ms. Mullen admitted she did not follow the policy and procedures outlined by Mr. Gebicke.  Specifically, Ms. Mullen admitted that Jabil did *not* wait for confirmation from GE before purchasing any raw material from that Forecast document.  *See* Tr. Tran. Day 1 [R. Doc. 147] at 142:4-14.

> Q:    So Jabil gets a document with forecast data, it uploads it into S.A.P., generates an M.P.S. report out of S.A.P., and then would send that S.A.P. report to G.E. by e-mail; correct?
>
> A:    With all the other information that would have been disclosed at the meeting.
>
> Q:    Okay.  And Jabil would wait for confirmation from G.E. before purchasing any raw material from that particular forecast document; correct?
>
> A:    No.  Once we received the forecast and have a discussion around it, that forecast is loaded.
>
> Q:    So you would not wait to get any kind of information from the customer about the M.P.S. report before driving material?
>
> A:    No . . . .

*See* Tr. Tran. Day 1 [R. Doc. 147] at 142:4-11.  Under New York law, Ms. Mullen's confirmation that Jabil violated its own supply chain management procedures during the MV4 project precludes Jabil from relying on those procedures to claim it purchased the raw material timely and not in advance of the delivery schedule.  This is especially apparent from Jabil's testimony that its violation of these policies can lead to excess material like the material at issue in this litigation.

Without evidence Jabil followed its policies and procedures to purchase the raw material "just-in-time," Jabil must provide direct evidence of when it purchased the raw materials.  But like in *Hirsch*, the record is devoid of any independent evidence to support this element of Jabil's claim.  It is undisputed that Jabil's purchase of raw material (including the decision on the quantity and timing of those purchases) is not performed automatically by Jabil's SAP system.  Instead, the SAP system creates purchase orders for the raw material, which are then altered and issued by Jabil's purchasing department.  *See* Tr. Tran. Day 1 [R. Doc. 147] at 133:25 – 134:6.  Jabil did not produce any purchase orders, nor did it provide any data showing the date it issued purchase orders for the raw material.  Nor did Jabil produce any witnesses with personal knowledge regarding when the raw materials were purchased.  Indeed, Ms. Mullens confirmed she did not issue any of the purchase orders for the raw material at issue, nor did she sign purchase orders for the raw material.  *See* Tr. Tran. Day 1 [R. Doc. 147] at 137:8 – 131:10.  Accordingly, Ms. Mullins could not provide affirmative evidence as to what raw materials were purchased, when they were purchased, or whether Jabil's purported supply chain management policies were followed in performing those activities.  And Jabil did not produce anyone from its purchasing department who could testify regarding those facts.

The District Court relied on Mr. Gebicke's testimony that an employee would be fired if he/she did not follow Jabil's procedures. *See* FFCL [R. Doc. 157] at ¶ 18. But the District Court's reliance on Mr. Gebicke's testimony is insufficient to show that Jabil actually followed its routine business practices during the MV4 project. At most, Mr. Gebicke's testimony about employees being terminated for not following policies and procedures is simply more generic testimony of Jabil's internal policies—not evidence that Jabil actually followed its policies as required under New York law.

Additionally, the District Court relied on Mr. Gebicke's testimony that Jabil's SAP system and internal procedures are "routinely audited" in support of its Judgment. *See* FFCL [R. Doc. 157] at ¶ 18. The record is devoid, however, of any evidence that Jabil performed an investigation of the raw material at issue to determine whether they were purchased just-in-time despite acknowledging that Jabil would conduct such an investigation in this circumstance. Mr. Gebicke testified that when there are large inventory discrepancies, he has investigated the details of those discrepancies "from all sides." *See* Tr. Tran. Day 1 [R. Doc. 147] at 235:18 – 236:2. He also testified that Jabil conducts audits regarding the lead time quoted by suppliers and compares the quoted lead time to the lead times actually input into the SAP system. *See* Tr. Tran. Day 1 [Doc. 147] at 238:4-12. Mr. Gebicke was not aware of any such audit being performed by Jabil for the MV4 project, nor

did Jabil submit any such audit at trial. *See* Tr. Tran. Day 1 [Doc. 147] at 238:4-19; 243:11-15.

Even Jabil's expert, Mr. Mottern, who had full access to Jabil's files, did not conduct any independent analysis of Jabil's claim or the SAP data. *See* Tr. Tran. Day 2 [R. Doc. 148] at 432:2-4. He did not discuss the SAP waterfall chart with its creator, Mr. Frank Ross (nor did Mr. Ross testify at trial); he did not review Jabil's purported document retention policy; he did not review Jabil's written supply chain management policies; and he did not ask anyone at Jabil to run a report showing date Jabil issued the purchase orders for the raw material at issue. *See* Tr. Tran. Day 2 [R. Doc. 148] at 426:11 – 427:11; 431:3-6. Instead, Mr. Mottern relied on Jabil's purchase order report to opine that Jabil purchased the raw material "just-in-time" because some of the purchase orders listed on the report include a notation of "JIT." *See* Tr. Tran. Day 2 [R. Doc. 148] at 428:21 – 25. But as Mr. Mottern also admitted, only *some* of the Jabil purchase orders included the "JIT" notation, and he did not provide any testimony as to why the non-"JIT" notated purchase orders should be considered to have been purchased timely under the terms of the Supply Agreement. *See* Tr. Tran. Day 2 [Doc. 148] at 435:2-21.

Accordingly, the District Court's reliance on Jabil's policies and procedures to find it did not purchase the raw material in advance of the time necessary to meet GE's delivery schedule fails because the record evidence demonstrates that Jabil did

not follow those policies and procedures during the MV4 project. Jabil has not satisfied its burden of proof in this breach of contract claim that it purchased raw material only for the amounts and in advance of the time necessary to meet GE's delivery schedule as required by the Supply Agreement, and its breach of contract claim, therefore, fails. This Court should, therefore, overturn the District Court's Judgment and dismiss Jabil's breach of contract claim against GE, with prejudice.

### 3.   THE DISTRICT COURT ERRED IN FINDING THE ALLEGED FORECASTS CAUSED JABIL'S CLAIMED DAMAGES.

The District Court also erred in applying New York law by finding Jabil's damages were caused by the alleged Forecasts issued by GE.[4] Under New York law, the damages claimed by the plaintiff on a breach of contract claim must be suffered as a result of the breach. *See, e.g., Bank of Am., N.A. v. Bear Sterns Asset Mgmt.*, 969 F. Supp. 2d 339, 350-51 (S.D.N.Y. 2013) (noting the plaintiff's inability to prove loss causation precluded recovery on its breach of contract claim); *see also Bausch & Lomb, Inc. v. Bressler,* 977 F.2d 720, 731 (2d Cir.1992) ("A plaintiff seeking damages for breach of contract . . . must demonstrate that the damages were caused by and are directly traceable to the . . . breach.") (citations and internal quotations omitted); *Am. Home Prods. v. CAMBR Co., Inc.,* No. 00 Civ.2021, 2001

---

[4] As noted, *supra*, courts of appeal review a district court's application of state law in a diversity case *de novo. See Taylor v. R.J. Reynolds Tobacco Co.*, 441 Fed. App'x 664, 665 (11th Cir. 2011).

WL 79903, at *4 (S.D.N.Y. Jan. 30, 2001) (stating that, under New York law, plaintiff must establish, *inter alia,* "damages suffered as a result of the breach").

Jabil has only filed this action for the recovery of costs for raw material it allegedly purchased pursuant to purported Forecasts issued by GE before October 2014. The District Court relied on the total alleged value of the raw material from the MV4 project in Jabil's inventory to award Jabil damages, finding that all raw material in Jabil's inventory was purchased pursuant to the alleged Forecasts. *See* FFCL [R. Doc. 157] at ¶¶ 28-31. The District Court's holding, however, is in direct contradiction to the record evidence. Jabil's own expert, Mr. Mottern, admitted at trial that the demand triggering the purchase of raw material in Jabil's SAP system consisted of **both** GE Purchase Orders **and** the alleged weekly forecasted demand. *See* Tr. Tran. Day 2 [R. Doc. 148] at 419:6-11. The SAP data does not identify what the source of the data is, nor did Jabil produce any witnesses who input that data into the SAP system or who could otherwise provide information regarding what raw material Jabil purchased pursuant to the alleged Forecasts versus separate Purchase Orders. So, even if GE issued the alleged Forecasts (which is denied), Jabil's inability to distinguish between raw material it allegedly purchased pursuant to the Purchase Orders versus the raw material it allegedly purchased pursuant to the purported Forecasts is fatal to its claim for damages. Thus, the District Court erred

in awarding damages to Jabil.  Jabil's inability to prove loss causation precluded recovery on its breach of contract claim.

**4.    THE DISTRICT COURT IGNORED VITAL EVIDENCE IN FINDING GE SENT WEEKLY FORECASTS UNDER THE SUPPLY AGREEMENT.**

In finding Jabil satisfied the first element required to recover the cost of excess raw materials under the Supply Agreement (that the raw materials were purchased pursuant to a Forecast or Purchase Order), the District Court ignored key documentary evidence refuting Jabil's assertion that it purchased the raw materials pursuant to almost weekly Forecasts. "An abuse of discretion occurs when the district court applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner ... or ignores or misunderstands the relevant evidence." *Sciarretta v. Lincoln Nat'l Life Ins.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (internal quotation marks omitted).

Here, the District Court abused its discretion in finding that Jabil purchased the raw material at issue pursuant to almost weekly Forecasts issued by GE by ignoring key relevant documentary evidence directly contrary to that finding.  Under the Supply Agreement, Jabil may only recover for the claimed raw material to the extent they were purchased pursuant to a *written* Forecast.  *See* Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement, § 1(c).  The District Court primarily relied on the testimony of Ms. Mullen to support its conclusion that GE sent weekly Forecasts to Jabil during the applicable period.  *See* FFCL [R. Doc. 157] at ¶ 5.  The District

37

Court ignored, however, the significant documentary evidence in the record that refuted Ms. Mullen's self-serving testimony.

In particular, Ms. Mullen claims GE issued Forecasts instead of Purchase Orders to drive the raw material, but GE submitted documentary evidence to the contrary. GE issued the three GE Purchase Orders to drive demand for the MV4 products, including the Power Modules. *See* Tr. Tran. Day 2 [R. Doc. 148] at 281:23-25; Joint Exhibits 4, 5, and 6 [R. Docs. 149-4, -5, -6]. Moreover, GE's emails show not only that the demands for the Power Modules were revised directly onto those Purchase Orders, but Jabil claimed that the revision of the Purchase Orders could lead to excess material. *See* Tr. Tran. Day 2 [R. Doc. 148] at 285:17 – 286:22; *see also* Joint Exhibit 36 [R. Doc. 149-36].

Additionally, Jabil's testimony that GE issued separate Forecasts prior to October 2014 is not supported by Jabil's demands to various GE employees in 2016, 2017, and 2018. In each of those communications, Jabil outlined the purported history of its purchase of raw material, and in none of those communications did Jabil reference pre-October 2014 Forecasts. *See* Joint Exhibits 29, 38, 43, 45, 48. [R. Docs. 149-29, -38, -43, -45, -48].

The District Court also incorrectly held that "[t]here is no evidence in the record that suggests that GE questioned Jabil's inventory of surplus material." *See* FFCL [R. Doc. 157] at 30. That statement is directly refuted by the documentary

38

evidence as GE *did* question Jabil's claims regarding the amount of raw material allegedly in its inventory. The documentary evidence demonstrates that GE employee, Mr. Fitz Gibbon, made specific inquiries related to the quantity of raw material that Jabil claimed was in its possession. *See* Joint Exhibit 33 [R. Doc. 149-33] at GE 18070, GE Comments (4/13/15) Column (inquiring why Jabil had 631 modules worth of certain components, 380 modules worth of another component, 546 modules worth of other components, *etc*.). Notably, Joint Exhibit 33 shows Jabil did not respond to any of Mr. Fitz Gibbon's inquiries regarding the number components Jabil was claiming in its inventory. *See* Joint Exhibit 33 [R. Doc. 149-33], GE 18070, Jabil Comments (4/13/15), Jabil Comments (5/6/15), Jabil Comments (5/28/15) Columns.

Further, Jabil has relied on its internal SAP records in support of its claim that it received a demand from GE to purchase the raw material. Both GE's and Jabil's experts testified those inputs could have been based upon GE Purchase Orders or the alleged Forecasts. In fact, Mr. Mottern testified that the demand in Jabil's SAP system consisted of ***both*** GE Purchase Orders and the alleged weekly forecasted demand. *See* Tr. Tran. Day 2 [R. Doc. 148] at 419:6-11. Mr. Mottern relied on Jabil's purchase order report to opine that Jabil purchased the raw material "just-in-time" because some of purchase orders on the report include a notation of "JIT."

39

But as Mr. Mottern also admitted, only *some* of the Jabil purchase orders included the "JIT" notation.

The documentary evidence also contradicts the District Court's finding the Purchase Orders could only be used to drive the building of the Power Modules, whereas Forecasts were required to drive the purchase of raw material. Not only did Mr. Bensing testify that a party could use any mechanism to drive demand in the SAP system, whether by purchase order, a forecast, or some other mechanism (*see* Tr. Tran. Day 2 [R. Doc. 148] at 282:22 – 283:7), his testimony is confirmed by the language of the Supply Agreement itself, which notes Jabil could buy material "in support of Buyer *Purchase Orders or in accordance with Buyer's Forecasts* . . . ." *See* Joint Exhibit 1 [R. Doc. 149-1], Supply Agreement at § 6(c) (emphasis added). This contractual language proves the parties intended Purchase Orders or Forecasts as driving the purchase of raw material. *See*, *e.g.*, *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219 (N.Y. App. 2003) ("The objective of contract interpretation is to determine what is the intention of the parties as derived from the language employed.") (internal quotations omitted).[5]  Nevertheless, the District Court relied on Jabil's self-serving testimony and ignored the documentary evidence contradicting same.  In light of the above documentary evidence, the District Court's

---

[5] In fact, Jabil's own expert, Mr. Mottern, agreed that both forecasts and purchase orders can be used to drive demand for raw materials. *See* Tr. Tran. Day 2 [R. Doc. 148] at 408:3-14; 419:6-11.

finding that GE sent weekly Forecasts to Jabil to trigger the purchase of the raw material at issue is an abuse of discretion as it is directly controverted by the documentary evidence.

Aside from the documentary evidence contradicting the District Court's findings, the lack of documentary evidence is also telling. The District Court relied on an unproduced document retention policy to excuse Jabil's inability to produce any of the Forecasts on which it relies. In so doing, the District Court never addressed the fact that Jabil's explanation for failing to produce the relevant documentation was contradicted at trial. In particular, Jabil claims all Forecasts were intentionally destroyed because of a two-year email retention policy, but Jabil admittedly produced and relied upon emails from the same time period in this action. *See* Joint Exhibits 13, 40, 41, 42 [R. Docs. 149-13, -40, -41, -42]. The existence of these emails contradicts Jabil's claim that it received (and destroyed) all documents showing GE sent almost weekly Forecasts prior to October 2014.

Additionally, the District Court's reliance on a partial email from Mr. Bensing purporting to be a Forecast dated December 10, 2013 is also not persuasive. The purported Forecast is plainly not a complete document on its face, and, as Mr. Bensing recognized, it could be missing key contextual language (if even authentic). Indeed, the forecast data in the December 10, 2013 email does not entirely match the data in Jabil's SAP system, and Ms. Mullen could not explain that discrepancy. *See*

Tr. Tran. Day1 [R. Doc. 147] at 91:20 – 92:10.  That discrepancy between the content of the email and Jabil's SAP system confirms Mr. Bensing's testimony that the partial email was missing important context.  Nevertheless, even if this Court were to accept the substance of this partial purported Forecast, this one Forecast does not support Jabil's claim that GE sent almost weekly Forecasts throughout 2014 and is insufficient to contradict the other documentary evidence supporting GE's use of separate, distinct Purchase Orders to drive demand for the MV4 Project.

In sum, Jabil has not satisfied its burden of proof in this breach of contract claim that GE issued the almost weekly Forecasts on which Jabil relies in support of its claim for excess inventory.  The fact GE issued revised Purchase Orders is evidenced by the documentary evidence.  Jabil relies on a document retention policy to explain why it has not produced the Forecasts at issue, but Jabil's production of documents from the same time period raises significant doubts.  The existence of the weekly Forecasts is also doubtful considering Jabil's continuous pre-litigation demands to GE that reference nothing about Forecasts issued prior to October 2014.  Jabil's internal SAP data also does not provide any information on the source of the quantity data therein, and Jabil did not produce any witnesses with personal knowledge about the source documents used to input that data.  This gap in evidence is especially significant given Mr. Mottern's testimony that the SAP data reflected demand quantities driven by GE's Purchase Orders and the purported Forecasts.

Even if this Court were to find GE issued the purported Forecasts, Jabil has not provided any evidence to distinguish what raw materials were purchased pursuant to the Purchase Orders and what was purchased pursuant to the Forecasts.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellant, General Electric Company, respectfully requests that this Court overturn the Judgment of the District Court and dismiss the claims asserted by Jabil Inc. against General Electric Company, with prejudice and at Jabil's costs.

*/s/ Michael D. Fisse*
Anthony C. Walsh (GA Bar No. 735063)
GE Gas Power
4200 Wildwood Parkway
Atlanta, Georgia 30339
Telephone:  678-844-6107
Email:        anthony.walsh@ge.com

Michael D. Fisse (LA Bar No. 19270)
Paul R. Trapani, III (LA Bar No. 32735)
Patrick B. Fisse (LA Bar No. 36457)
Daigle Fisse & Kessenich, PLC
227 Highway 21
Madisonville, Louisiana 70447
Tel: 985-871-0800; Fax: 985-871-0899
Email:        mfisse@daiglefisse.com
                  ptrapani@daiglefisse.com
                  pfisse@daiglefisse.com
***Attorneys for General Electric Company***

## **CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 10,227 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Word in Microsoft 365, 14 point Times New Roman font.

*/s/ Michael D. Fisse*
MICHAEL D. FISSE, ESQ.
Attorney for General Electric Company
Date: December 21, 2023

## **CERTIFICATE OF SERVICE**

Undersigned counsel certifies that services of this Original Brief was made on counsel for Jabil Inc. by filing through this Court's electronic-filing system on this 21st day of December 2023.

*/s/ Michael D. Fisse*
MICHAEL D. FISSE, ESQ.
Attorney for General Electric Company
Date: December 21, 2023